IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 10-441 |
| | : | |
| KAREEM GREENWOOD | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                                                                  **February 1, 2011**

Defendant Kareem Greenwood seeks to suppress a firearm recovered during a January 15, 2010, traffic stop, arguing the firearm was obtained as a result of an unconstitutional search and seizure.[1]  Because the police officer had probable cause to believe Greenwood was operating a vehicle in violation of Pennsylvania law and reasonably suspected Greenwood posed a danger to him, this Court will deny the motion to suppress.

**FINDINGS OF FACT**

1.      On January 15, 2010, Philadelphia police officer David O'Connor was assigned to patrol the Germantown area of the city.

2.      Police had received numerous complaints of narcotics and firearm sales in the Germantown area.

3.      At approximately 9:30 a.m., while O'Connor was traveling east on East Tulpehocken Street, he observed a tan Buick Century being driven in the opposite direction by Greenwood.

4.      O'Connor noticed the inspection and emissions stickers located on the windshield of the Buick had expired in October 2009, so he made a U-turn and activated his overhead lights

---

[1] Authorities also recovered a bag of white powder from Greenwood's car and cash from Greenwood's pockets.  Because Greenwood has not moved to suppress either of these items, this Court need not address their admissibility.

and siren. Greenwood promptly stopped his car near the curb of East Mayland Street, one block north of East Tulpehocken Street. O'Connor parked his patrol car directly behind the vehicle and left the overhead lights on.

5.  O'Connor approached Greenwood and requested his license, registration, and proof of insurance. Greenwood complied. After verifying the validity of Greenwood's documents, O'Connor decided to issue Greenwood a citation for the expired emissions and inspection stickers and returned to his car to prepare the citation.

6.  When O'Connor returned from his patrol car to the driver's side window of the vehicle, Greenwood refused to make eye contact with him, keeping his head crouched down and his gaze directed downward. Meanwhile, Greenwood's hands were tucked near his groin area.

7.  Because he was aware of complaints regarding illegal narcotics and firearms sales in the area, upon observing Greenwood's posture and sudden change in demeanor O'Connor became worried Greenwood had a weapon. To ensure his safety and determine whether Greenwood had a weapon, O'Connor asked Greenwood what he was doing. Greenwood lifted his head and said, "Huh?" O'Connor repeated the question and received the same answer.

8.  O'Connor then asked Greenwood to place his hands on the steering wheel. Greenwood complied only after O'Connor repeated his command several times.

9.  O'Connor asked Greenwood to step out of the vehicle because of his concern Greenwood was concealing a weapon. Greenwood asked why, and O'Connor informed Greenwood he intended to conduct a frisk. After Greenwood became somewhat combative, O'Connor called for backup.

10. Greenwood then refused to comply with numerous commands to step out of the vehicle, and

O'Connor unholstered his firearm before again ordering Greenwood to step out of the vehicle. Eventually, Greenwood complied.

11.     When Greenwood exited the vehicle, O'Connor handcuffed him for safety and performed a safety frisk of Greenwood's outer clothing. When O'Connor patted the exterior of Greenwood's clothing between his legs, he felt a hard metallic object that was the size and shape of a firearm.

12.     O'Connor asked Greenwood to explain what the object was between his legs, and Greenwood said it was an inhaler. When O'Connor again asked what the object was, Greenwood said, "It's not a gun."

13.     Believing the object to be a firearm, O'Connor asked Greenwood to separate his legs so he could better feel the object. When Greenwood spread his legs apart, a firearm fell from his pant leg and onto the street.

14.     O'Connor picked up the firearm and, because the backup officers had not yet arrived, placed it in the rear pocket of his pants. The firearm was a loaded black .32 caliber Walther with a serial number of 412247.

15.     When the backup officers arrived, Greenwood was placed in the backseat of O'Connor's patrol car. After Greenwood was secured, O'Connor searched the area of the vehicle within Greenwood's immediate control to ensure no other weapons were hidden there.

16.     Greenwood introduced testimony from three witnesses to support his contention he was working under the hood of his parked car when O'Connor approached him and searched the vehicle. This Court finds such testimony is not credible or irrelevant to this Court's determination of whether Greenwood's constitutional rights were violated.

17. Greenwood's first witness, Roderick Price, was visiting a residence on the 100 block of East Mayland Street at approximately 9:15 a.m., when he observed a police car parked behind a Buick on East Mayland Street while he saw an officer looking inside the vehicle and beneath the hood. He did not see Greenwood at any point and did not observe the officer frisk Greenwood or find a firearm.

18. Greenwood's second witness, Michael Hobbs, lived on East Mayland Street and knew Greenwood, whose grandparents also lived on East Mayland Street. Hobbs testified he was walking home from work between 8:30 a.m. and 9:00 a.m. and observed a tan Buick, which he recognized because it had belonged to Greenwood's grandparents, with the hood up and the passenger door open. He also testified he saw a police officer in the car's back seat, but did not see the officer frisk Greenwood or find a firearm.

19. This Court finds that neither Hobbs's nor Price's testimony adds any relevant evidence to the record. Neither witness observed Greenwood working on his car, saw O'Connor remove Greenwood from the vehicle and frisk him, or saw O'Connor recover the firearm. To the extent the witnesses testified they saw O'Connor inspecting the vehicle outside Greenwood's presence, their testimony is consistent with O'Connor's testimony that he performed a protective sweep of the vehicle after placing Greenwood in the back seat of his police car. Additionally, this Court finds their testimony the hood of the vehicle was up when they saw O'Connor inside the vehicle is not credible.

20. Greenwood's third witness, Zalicka Fletcher, the owner of the Buick and the mother of Greenwood's child, Fletcher stated the Buick's engine began to smoke on the morning of January 15, 2010, and she had the car towed to the 100 block of East Mayland Street so

Greenwood could repair the car. She testified that, upon arrival, she lifted the hood of the vehicle and Greenwood came out of his grandparents' house. As Greenwood looked under the hood, Fletcher walked away, and when she turned around she observed a police car parked in the middle of the street near the Buick. Fletcher stated police had placed Greenwood in the police car by the time she got back to the vehicle.

21.     Fletcher's testimony was internally inconsistent and inconsistent with the testimony of other witnesses. Although she testified during direct examination that she walked away from the scene and returned when she saw police activity near her car, when Greenwood was already in police custody, during cross-examination Fletcher testified she had observed the police approach the scene of the incident, recover a weapon, and place Greenwood in the back seat of the police car. She also testified that the police car was parked in the middle of the street, which is inconsistent with the statements of other eyewitnesses that the police car was parked behind the Buick.

22.     Additionally, Fletcher testified that she had purchased the tan Buick for $1,000 from Greenwood's grandparents. However, the Government produced an "affidavit of gift" bearing her signature which indicated she had received the Buick as a gift.

23.     In light of such inconsistencies and the bias inherent in Fletcher's close relationship to Greenwood, the Court finds Fletcher's testimony is not credible.

**DISCUSSION**

The Fourth Amendment guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250

(1991). While a warrant based on probable cause is generally required to justify a search or seizure, in limited circumstances a warrantless search or seizure can satisfy the reasonableness requirement of the Fourth Amendment. *United States v. Crandell*, 554 F.3d 79, 83 (3d Cir. 2009).

Because a traffic stop is a seizure for Fourth Amendment purposes, *see United States v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009), this Court must first determine whether the stop of Greenwood's vehicle was reasonable. "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). Pennsylvania law requires all motor vehicles operated on public roads to display "a currently valid certificate of inspection." 75 Pa. Cons. Stat. § 4703(a). Because, O'Connor noticed the inspection and emissions stickers on Greenwood's windshield had expired, Greenwood's failure to comply with § 4703(a) justified O'Connor's decision to stop Greenwood's vehicle.

The next issue is whether O'Connor's frisk of Greenwood violated the Fourth Amendment. "After a traffic stop that was justified at its inception, an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003). "In determining whether there was a basis for reasonable suspicion, a court must consider the totality of the circumstances, in light of the officer's experience." *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). To frisk the occupant of a vehicle incident to a traffic stop, an officer must have an "articulable and objectively reasonable belief that the suspect is potentially dangerous." *Michigan v. Long*, 463 U.S. 1032, 1051 (1983); *see also United States v. Gant*, 412 F. Supp. 2d 451, 454 (E.D. Pa. 2005) ("The police may also frisk a

vehicle's occupants and search the passenger compartment if they have reasonable suspicion that the occupants might be armed and dangerous.").

O'Connor had a reasonable and articulable suspicion Greenwood was potentially dangerous. O'Connor knew police had received complaints of illegal firearms trafficking in the neighborhood in which he stopped Greenwood's vehicle. *See United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984) ("The reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely."). He also observed an unexplainable change in Greenwood's demeanor. Initially, Greenwood was respectful and compliant; however, when O'Connor returned to the vehicle to issue a citation, Greenwood refused to look O'Connor in the eye and kept his hands near his groin area. When O'Connor twice asked Greenwood what he was doing, Greenwood provided no explanation. Then, O'Connor had to order Greenwood several times to place his hands on the steering wheel before Greenwood complied. Additionally, when O'Connor ordered Greenwood to step out of the vehicle, Greenwood was initially noncompliant and, upon being informed that O'Connor intended to frisk him, became somewhat combative. *See United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997) (holding a suspect's "furtive hand movements and refusal to obey the officers' orders constituted suspicious behavior"). Thus, O'Connor was justified in frisking Greenwood to ensure he was not armed and dangerous.

**CONCLUSIONS OF LAW**

1.  O'Connor's stop of the vehicle Greenwood was driving was reasonable and did not violate the Fourth Amendment because O'Connor had probable cause to believe Greenwood was operating the vehicle without valid inspection and emissions stickers in violation of Pennsylvania law.

7

2.     O'Connor's frisk of Greenwood was not unconstitutional because O'Connor had an

objectively reasonable and articulable suspicion Greenwood was presently dangerous.


Greenwood's motion to suppress is denied.  An appropriate Order follows.


                              BY THE COURT:


                              ___\s\ Juan R. Sánchez_____
                              Juan R. Sánchez, J.